**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

**UNITED STATES OF AMERICA**

                                       **15 Cr. 95 (AJN)**

        V.

**FABIAN MORRISON,**

             **Defendant.**

-----------------------------------------------------X

## SENTENCING MEMORANDUM
## ON BEHALF OF FABIAN MORRISON

On behalf of our client, Fabian Morrison, we respectfully submit this memorandum in order to advise your Honor of several matters that the defense will raise at the time of his sentencing to aid in the determination of the appropriate sentence. Mr. Morrison entered a plea of guilty before the Honorable Andrew J. Peck, U.S.M.J. on August 14, 2017, to a superseding Information which charged him with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962 (d); and Assault on an MDC Correction Officer, in violation of 18 U.S.C. §§ 111(a)(b) and 1114. Mr. Morrison's sentencing is scheduled to take place before your Honor on December 19, 2017, at 11:000 a.m. At that hearing, the defense will respectfully ask the Court to impose a non-Guidelines sentence with a term of imprisonment of sixty (60) months, which by the application of U.S.S.G. § 5G1.3(b)(1) and (2) must be adjusted to nineteen (19) months.[1]  The following discussion will demonstrate

---

[1] On October 14, 2015, Fabian Morrison was sentenced to, and is currently serving, a term of incarceration of 41 months for being a felon in possession of a firearm. He has been detained on this sentence since his arrest on January 21, 2015. The firearm is relevant conduct to Count One

that a period of incarceration of sixty (60)  months would be sufficient, but not greater than necessary, to fulfill the goals of sentencing.

## I.    DETERMINING THE REASONABLE SENTENCE

### A. *The Legal Standard:  The Parsimony Clause*

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence ***sufficient, but not greater than necessary***" to achieve the purposes and goals of sentencing (emphasis supplied).  This duty, embodied in the "parsimony clause," governs every federal sentencing "except as otherwise specifically provided."18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines the Court's "overarching duty" in reaching a reasonable sentence. *Pepper v. United States,* 131 S. Ct. 1229, 1243 (2011).

Among the factors to be considered in arriving at a just sentence are the history and characteristics of the defendant, and the circumstances of his involvement in the offense.  The sentence should also reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

As the Supreme Court reaffirmed in *Pepper*, in light of the long-accepted principle that "the punishment should fit the offender and not merely the crime,"

---

- the Racketeering Conspiracy herein.  Since the 41-month sentence would not be credited to the instant federal sentence by the Federal Bureau of Prisons, the Court must adjust the instant sentence by subtracting forty-one (41) months from sixty (60) months and impose a sentence of 19 months to run concurrently with his undischarged term of imprisonment. (U.S.S.G. §5G1.3(b)(1) and (2)).

the "sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 131 S. Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007).  Indeed, the Supreme Court has reiterated in *Nelson v. United States*, 555 U.S. 350, 352 (2009) that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed reasonable*" (emphasis in original).  Rather, the sentencing judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." Id. at 597. The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).

### B. Calculating the U. S. Sentencing Guidelines sentencing range:

Although the Court must begin each sentencing hearing by determining the correct Guidelines calculations applicable in each case, the Court must then conduct its own independent review of the sentencing factors.  Here, at the time of the plea entry, the parties stipulated that the correct Guidelines range for Fabian Morrison included a term of imprisonment of 84-105 months, based upon a Total Offense Level of 25, and a Criminal History Category IV.  (*See PSR*, pp. 14-19, 24).

3

### C.  Introduction to the Sentencing Factors to Consider Pursuant to 18 USC § 3553(a):

As discussed in detail for the Court below, there are compelling reasons why the sentencing factors set forth in 18 USC § 3553(a) favor a sentence of sixty (60) months. A review of Mr. Morrison's Personal History and Characteristics will reveal that he is a twenty-eight-year-old young man who grew up in a home where the discord between his parents severely affected his psychosocial development. Although his material needs were generally met by his mother, he was denied the basic supervision, guidance and structure that a child requires. Instead, he was left to his own devices for much of his childhood and adolescent years.  As a consequence, he was diagnosed by school testing as an emotionally disturbed child who should receive special education classes and therapeutic treatment.

Unfortunately, however, those needs remained unmet.  When he dropped out of school at age 16, his life seemed vacant, insecure and aimless except for his daily use of marijuana.  A regular user since age 13, his chief motivating goal was to sell enough marijuana every day to support his own consumption.  Eventually, his connection to, and involvement in, the neighborhood gang that was in charge of all drug-dealing became inevitable.

But nothing in his history suggests an inclination to violent behavior.  A review of the nature and circumstances of his assault on a Correction Officer will show that there are compelling factors which serve as mitigation of this offense.

## II.    FABIAN MORRISON'S  PERSONAL HISTORY[2]

### A. Childhood and Family

Fabian Morrison is a 28-year old Black male of Jamaican descent, the only child of the union of Lola Curtis and Anthony ("Tony") Morrison.  Both of his parents were born and reared in Jamaica but met in the Untied States.  Lola is a registered nurse, employed at the North General Hospital in the Bronx for the past 27 years.  Anthony is self-employed in construction.

After being abandoned by her own mother, Lola Curtis was raised primarily by her father, stepmother and grandmother Doris McKay Curtis in Jamaica. Eventually, she came to live with her grandmother in Brooklyn, New York in 1972.  Lola's grandmother was her role model, particularly as an example of achievement through hard work and the prudent use of money.  It was her grandmother that gave Lola a sense of worth and the opportunity to succeed.  After graduating from Canarsie High School, Lola went to Bronx Community College, where she graduated with a degree in Nursing.

Anthony Morrison, Fabian's father, was raised by his grandparents in Jamaica after his parents left the island when he was three years old.  Educated only up to the 6th grade, he received some vocational training in welding and metal

---

[2] Exhibit A, The Social History is based on numerous interviews conducted with Fabian and his family members by his Mitigation Specialist Carmeat Albarus-Lindo. Further information was corroborated or enhanced through available records. The records reviewed in the preparation of this report include Immaculate Conception Catholic School; Education records from NYC Department of Education; School of Cooperative Technical Education; Wings Academy; GED Certificate; Montefiore Medical Center, Wakefield; MDC Brooklyn Education Department Certificate in Resume Writing; MDC Recreation Department, Certificate of Completion in Cardio Training; MDC Brooklyn Recreation Department, Certificate of Completion of Health Program; and The Pre Sentence Report.

work.  He migrated to the United States when he was in his early thirties.

After meeting in New York, Anthony and Lola lived together for three years before Fabian's birth.  But after Lola became pregnant, their relationship deteriorated dramatically.  Anthony, who already had a daughter back in Jamaica, was not nearly as enthusiastic about having a child as was Lola.  To Lola it was apparent that Anthony resented having to contribute more to the family after Fabian was born.   Frankly, he appeared to prefer drinking and gambling with his friends to helping care for Fabian. As the primary income earner, Lola expected Anthony to babysit with Fabian while she was at work.  Instead, however, his irresponsible behavior repeatedly put little Fabian at risk.  The last straw for Lola was when she came home from work one day and discovered that Anthony and the baby were missing.  After a frantic search, she finally found little Fabian alone in a car, while Anthony was inside a "club," gambling.

When Lola told Anthony that she could no longer put up with his neglect of their son, he left the household, returning only to make rare appearances. Consequently, as he grew up, Fabian was acutely aware that he was little more than an annoyance to his father.  Today Fabian describes how Anthony often made him feel "forsaken." "I don't ever remember my dad hugging me – I don't think he really knew how to be a dad."

Lola struggled to take care of Fabian on her own, and to give him the nurture and supervision he deserved and needed. While going to Bronx Community College, she lacked the money for a baby sitter, so she would take him to classes with her where "he'd sit there quietly."  But working long hours to complete required stints as an EMT, EKG technician or nurse's aid left Lola too tired to attend to Fabian's needs after she came home from work.

Fabian speaks of how much he always wanted to serve as a valuable helper

to his mother.  As a boy he saw and appreciated that she made so many sacrifices for his benefit – to provide a home for them both.  Routinely, Fabian would wash and iron Lola's uniform, and do the cooking and cleaning.  "I knew it was just me that she had.  I knew I had to be the man of the house."   He was 11 years old.

### B.   Educational History, Mental Health Diagnosis, Substance Abuse History

From pre-kindergarten to the third grade, Fabian attended Immaculate Conception Catholic School.  Little Fabian did well at Immaculate Conception, where he seemed to benefit from the structure and discipline the school afforded him.  But his life dramatically changed in 4th grade, when his mother's dire financial situation meant that Fabian had to move to a different neighborhood and enroll in the New York City Public Schools. Now he became aware that his environment was fraught with violent interactions.  As a smaller boy, he was repeatedly bullied and beaten up.  He recalls that he was forced to adjust to a new neighborhood and schools where survival hinged on his ability to protect himself.

When he was eleven years old, Fabian was diagnosed by school testing as "emotionally disturbed."  The evaluation found that Fabian had a "great deal of anxiety, poor ego boundaries, and feelings of inadequacy and insecurity; with feelings of withdrawal, guilt and/or discouragement, and difficulty navigating his environment."   His emotional issues were assessed as interfering with his ability to function at an optimal level in the classroom and to perform academically.

The finding of emotional disturbance made Fabian eligible for special education services.  He was scheduled for placement in a small-group special class with a ration of 12 students to one teacher.  He was scheduled to receive individual counseling and group counseling once a week.  Regrettably, however, Fabian's

mother took issue with the school's placement and initially refused to consent to his special education placement.

The following year, in the 7th grade, Fabian showed little or no improvement in his socio-emotional and academic functioning in school.  Rather, there was a marked increase in absences and tardiness.  He was failing all his classes except English and Physical Education.  It was noted that he "responded positively to reassurances, encouragement and praise;" and that he worked better in a one-to-one supervised setting than independently.

In May of 2003, an Individualized Education Program ("EIP") classified Fabian as non-handicapped and returned him to general education with no services (even though another EIP still classified him as emotionally disturbed and recommended special class with related services).  He was described as having made progress in his behavior and in his academic performance; and being "generally well-behaved," trying to "demonstrate his own self-control," and showing "greater motivation."   Fabian was 13 years old and in the 8th grade. Despite the descriptions of "progress," however, it appears that the lack of consistent structure and guidance continued to discourage him.  The records note that he continued to struggle with feelings of anxiety, sadness and isolation, primarily stemming from long term-deprivation of the attention he needed at home. When Fabian dropped out of school in the 11th grade, he lost any semblance of structure and supervision in his daily life.

Mr. Morrison began using marijuana when he was 13 years old.  He says that smoking marijuana relaxed and calmed him.  At first he'd use half of his $10.00 daily allowance to buy marijuana, until his mother smelled it on him and cut off his allowance.  Thus it was that Fabian began to sell marijuana in order to support his own use of marijuana.

### C.  His Fiance, Dominque Grant, and Fatherhood

Fabian Morrison believes that his father's obvious disdain for the responsibilities of fatherhood only stirred and inspired his own desire to be a devoted father.  Today he is the father of three children: a son named Fabian Amir Anthony Morrison, Jr. who will be seven on January 14th; and two daughters, Keylaiah Morrison, age seven, and her sister Katora Morrison, who will be four on January 6th.

Dominique Grant, Mr. Morrison's finance, is Keylaiah and Katora's mother. Dominique has known Mr. Morrison since 2008 when the pair started dating.  She currently works at a senior citizens' home and is extremely supportive of Mr. Morrison, whom she describes as a "great father."  She says that Mr. Morrison earnestly wanted to become a father at age 19  because he needed to experience a "true father-child relationship."   He speaks proudly about how, unlike his own father, he is involved in his children's lives. For example, he recently described his close relationship with Keylaiah, whom he regularly took to and from school;  and added, with noticeable pride and satisfaction, that he'd comb her hair, make  her lunch and help her with her homework.  The girls' grandmother, Lola, confirms that when Fabian is home, he spends most of his time with his daughters.  Both his fiancé, Dominique, and his mother, Lola, describe how Fabian has been re-evaluating his life, and making decisions to enhance his well-being and that of his children.  His plans for the future include moving out of the neighborhood that has played such a large part in promoting his prior criminal conduct.  To that end, Mr. Morrison is greatly encouraged that his mother has moved the family to Mount Vernon.

Fabian Amir Anthony Morrison, Jr.'s mother is Nadia Black, who has

9

known Mr. Morrison since he was 17 years old. Mr. Morrison's relationship with his son (whom he calls "Amir") has not been as consistent as his relationship with his daughters because Nadia and Amir have been living in Jamaica for nearly three years.  Nevertheless, Nadia describes Mr. Morrison as an excellent father to Amir. She says that Mr. Morrison was the "kind of father who would sacrifice himself to ensure that his kids had what they needed."  Nadia added that she knows that one of Mr. Morrison's biggest concerns is his absence from his son's life.  He is committed to making sure that he will be there to give guidance and protection to his children, and particularly to his son.  Fabian Morrison knows that his son needs to have a positive male role model, and has an ardent desire to fulfill that role. Nadia says,  "He talks about that all the time, that he doesn't want him (Amir) to make the same mistakes that he did."

## III.  THE NATURE AND CIRCUMSTANCES OF FABIAN MORRISON'S INVOLVEMENT IN THE RACKETEERING CONSPIRACY

On April 27, 2016, Fabian Morrison was arrested as part of the massive sweep of 120 people from the North Bronx, which resulted in the instant indictment and the companion indictment U.S. v. Parrish, et al., 16 Cr. 212 (LAK). Those arrested were accused of participating in an over-arching Enterprise that engaged in crack-cocaine and marijuana trafficking, armed robberies, bank fraud, counterfeiting, multiple murders and the use of firearms.  Consequently, Counsel was initially appointed as *Learned Capital Counsel* because, even though Mr. Morrison was only charged with participating in the Racketeering Conspiracy, the Narcotics  Distribution Conspiracy and the use of firearms in relation to those

charges, there was concern that he, like many others arrested, could eventually be exposed to charges for death-eligible crimes.

That initial concern never materialized.  Indeed, assessment of the various roles played by more than one hundred individuals showed that Mr. Morrison was not a candidate for capital charges.  Accordingly, after the Government had an opportunity to sort out the nature of the involvement attributable to each co-defendant, the Government offered Fabian Morrison the instant plea agreement.  In pleading guilty, he acknowledged that he was an associate of the charged Enterprise; that he was aware of various activities that the charged Enterprise engaged in; and that as a participant in the Enterprise he agreed to make, and did make, sales of marijuana.

## IV.  THE NATURE AND CIRCUMSTANCES OF MR. MORRISON'S INVOLVEMENT IN ASSAULTING A CORRECTIONS OFFICER

### A.  *The Assault and The Video*

On March 27, 2016, Fabian Morrison was *writted* into the Southern District of New York and presented on the original Racketeering Indictment. Mr. Morrison was ordered detained and transferred to the Metropolitan Correction Center – New York ("MCC").  Mr. Morrison was eventually housed in Unit 5-South. Correction Officer Brian O'Connor (hereinafter "CO O'Connor) worked on 5-South.

A video taken by a surveillance camera on 5-South (Exhibit C, "The Video") was provided to the Defendant in Discovery.  The assault on CO O'Conner happened on July 25, 2016 between approximately 6:16 and 6:22 pm, in one of the tiers of Unit 5-South.  What follows is a description of the incident, based upon

what can be seen in The Video as well as upon interviews with two inmate eye-witnesses and the defendant Fabian Morrison.  As noted in the PSR, CO O'Connor, who is no longer employed by the Bureau of Prisons, declined to provide an account of the incident to the Probation Office (PSR, par. 25).

For the purposes of this discussion, I will refer to images at the top of the scene depicted on The Video as "N."  Images to the right side will be referred to as "E;" images at the bottom as "S;" and images on the left side as "W."

- Located at "W" on The Video, there is a small, glass-enclosed office, commonly referred to as "the Bubble."  Correction officers would periodically sit in the Bubble, which is equipped with computers and screen displays.
- Located at approximately "N" on The Video, there are two stairways leading to an upper and lower tier; on each tier there are eight (8) two-man cells (four (4) cells on the left and four (4) on the right of the tier).
- Located at "E" on The Video there is another set of stairs leading to an upper and lower tier; again, on each tier there are eight (8) two-man cells.  Mr. Morrison's cell was located on the lower tier of the "E" stairway.
- During the relevant times in The Video, the cells were open and the inmate were permitted to be out of their cells.

The regular routine at the MCC in July 2017 included a mandatory "count" of inmates in the afternoon, at approximately 4:00 p.m. each day.  During a count, all inmates were required to be in their locked cells. Once the afternoon count was complete, usually around 5:00 - 5:15 p.m., inmates on 5 South were permitted to leave their cells, but unless they had special permission to go elsewhere (e.g., to a

work assignment or an attorney visit), they were required to remain within the Unit.

On July 25, 2016, the date of the assault, two inmates named Alex Christie and Joseph Steele were detained at the MCC in Unit 5-South.  Both Christie (BOP Register Number 92476-054) and Steele (BOP Register Number 73353-054) witnessed some of the events involving Defendant Morrison and CO O'Connor from somewhat different vantage points.  On December 16, 2016, the Defendant's investigator Ronald Dwyer and I showed Alex Christie The Video of July 25, 2016, and interviewed him about the events of that evening.   On January 22, 2017, Ronald Dwyer and I showed Joseph Steele The Video and interviewed him about the events of that evening.  I have also viewed and discussed The Video numerous times with Mr. Morrison. The following is a compilation describing the events of July 25, 2016, based upon what Mr. Christie, Mr. Steele and Mr. Morrison witnessed, and their comments about various scenes displayed on The Video (Exhibit C).

The Video begins at 6:15:57 P.M. To the right of the "W" stairs there is a computer, where inmates can review discovery.  Seated at the computer were Alex Christie, who was reviewing Discovery with Donque Tyrell ("Polo") and Richard Phillips (wearing a white T-shirt).  Mr. Christie remembered being at the computer with Defendant Morrison as well as Tyrell and Phillips for approximately an hour before The Video starts.  Alex Christie and Fabian Morrison were from the same neighborhood and had known each other for approximately ten (10) years.  Mr. Morrison was wearing a brown T-shirt, tan shorts and orange boxer shorts.  Mr. Christie and Mr. Morrison both recall that Mr. Morrison asked Mr. Christie, "Who braids your hair?" and Mr. Christie replied, "Jo-Jo" (Mr. Joseph Steele).  Mr. Morrison asked Mr. Christie to find out if Jo-Jo would do his hair too, and

wondered how much Jo-Jo would charge. Mr. Christie recalls telling Mr. Morrison,
"Five dollars, but don't worry; Jo-Jo's my son, we got you."  As they continued
reviewing Discovery around the computer station, Mr. Morrison began to comb-
out his hair and apply an 'African hair product,' in anticipation of having Jo-Jo
braid his hair.

Before that day, Joseph Steele ("Jo-Jo") did not know Mr. Morrison.   Mr.
Steele recalls that as soon as the Count had cleared that day, he came out of his cell
(which was in the upper tier off the "N" stairs, the 4th cell on the right). At
approximately 5:00 P.M. – more than an hour before The Video starts – Mr. Steele
heard something that, to his mind, presaged the coming events.  As Mr. Steele was
setting up the double-chair that he used to braid and cut hair, he overheard CO
O'Connor, who appeared quite agitated, telling another Correction Officer: "I'm
going to knock his gold teeth out of his mouth!"  At this point, Mr. Steele had no
idea who CO O'Connor was referring to and had not met Mr. Morrison, nor did he
know that Mr. Morrison had a gold 'grill' on the front of his teeth.

Mr. Steele remembers that at approximately 5:30 he ate his supper, alone, in
his own cell. After Mr. Steele finished eating, Fabian Morrison came up the "N"
staircase to get his hair done, and sat down in Mr. Steele's chair. Mr. Steele recalls
that Mr. Morrison was dressed in a brown t-shirt, light-colored shorts and orange
boxers.  Mr. Morrison explained that he only had orange boxers because he had
recently been discharged from the Special Housing Unit (SHU). Inmates in the
SHU wear an orange jump suits, orange t-shirts and orange boxers. When Mr.
Morrison was discharged from the SHU, the Unit did not have any clean brown
boxers.  It is an infraction to wear orange clothing outside of the SHU; indeed,
elsewhere in the institution, orange boxers are designated as contraband. But when
Mr. Morrison was discharged from the SHU, he was told to keep the orange

underwear until he was given the correct color once he was in general population. On July 25th, Mr. Morrison still  had not been given clean brown boxers.

At 6:16:55 p.m., CO O'Connor is shown on The Video coming up from the lower tier on the "E" stairs, and continuing on the "E" stairs to the upper tier.   He is seen carrying a plastic bag.  At this point, Mr. Morrison was sitting in Mr. Steele's hair-styling chair., but his cell was on the lower tier where CO O'Connor had just been.   It was well-known in the Unit that CO O'Connor had a regular practice of going into cells looking for "contraband," and that he would put confiscated contraband into a plastic bag.  While Mr. Morrison was sitting in Mr. Steele's chair, an inmate came up to them and told Mr. Morrison, "O'Connor is in your cell."  Joseph Steele recalls Mr. Morrison saying, "I got nothing to hide, I just came out of "the Box" (i.e., The Special Housing Unit – 'SHU').  The man is just doing his job." By this time, Mr. Steele had noticed the gold 'grill' on Mr. Morrison's teeth, but he did not mention what he had earlier heard CO O'Connor say about knocking a man's gold teeth out of his mouth.

At 6:17:24 CO O'Connor came down the "E" stairs and (6:17:30) proceeded up the "N" stairs to where Mr. Steele was styling Mr. Morrison's hair.   CO O'Connor began going into the cells on the right side of the tier, apparently continuing his search for contraband.   At this point, Mr. Morison noticed orange boxers in CO O'Connor's plastic bag, and assumed they must have been removed from his cell.   Both Joseph Steele and defendant Morrison remember that Morrison asked, "Can I speak with you?" (in particular, Mr. Steele notes that Mr. Morrison asked this in a "polite manner.")  When CO O'Connor did not respond, Mr. Morrison said: "Why did you take my boxers? I just came out of the Box and they didn't have any brown ones." CO O'Connor, however, ignored Mr. Morrison and refused to respond.  When he started back down the "N" stairs (6:17:57), Mr.

15

Morrison yelled after him, "Nigger! Those are the only ones I have, they gave them to me after the Box."  In response, at 6:18:01, CO O'Connor whirled around and ran back up the "N" stairs.  Joseph Steele recalls that CO O'Connor appeared inflamed and flushed.  He threw the plastic bag against the first cell door on the right and yelled at Mr. Morrison: "What did you say, what did you call me?!" (CO O'Conner is a white male; he appears to be several inches taller than Mr. Morrison, who is 5'11," and appears to weigh approximately fifty (50) pounds more than Mr. Morrison, who weighs 190 pounds).

At approximately 6:16:07, The Video shows a crowd of inmates gathering at the foot of the "N" stairs, watching the upper tier.  Mr. Steele remembers that Mr. Morrison simply remained sitting in the chair.  At that point, CO O'Conner ordered "Everybody off the tier!"  As Mr. Steele started to walk away, he saw CO O'Connor bend close to Mr. Morrison's face, with his hand on his mace, and yell again, "What did you call me?!" Mr. Morrison, who was still sitting in the chair, replied: "You Police, I can't fight you. You Police." At that point (6:18:41) CO O'Connor went down the stairs and the crowd disbursed.  At 6:18:47, The Video shows CO O'Connor descending the "E" stairs.

Alex Christie, who had been watching from below, and the others returned to the inmates' computer station. It appeared to Mr. Christie that the incident was over.  Mr. Steele recalls telling Mr. Morrison: "Man, you handled that very cool." To which Mr. Morrison replied: "I knew if I said anything, or acted up, he'd mace me." Mr. Steele resumed braiding Mr. Morrison's hair.

At 6:20:19 CO O'Connor came back up the "E" stairs from the lower tier, and threw the plastic bag into the Bubble office.  Then he immediately turned and went up the "N" stairs again at 6:20:40. Once CO O'Connor was on the upper tier, where Joseph Steele was still braiding the defendant's hair, Mr. Steele heard him

yell: "Everybody off the tier!"  Then he saw CO O'Connor turn to Mr. Morrison

and order: "Get against the wall!"  To which Mr. Morrison replied: "You need to

see a psychiatrist."  According to Mr. Steele, at this point CO O'Connor "lost it."

Mr. Steele describes how the CO grabbed Mr. Morrison, yanked him out of the

chair, spun him around and threw him against the wall, "so hard that his (Mr.

Morrison's) head hit the wall."   Mr. Steele then observed CO O'Conner hit Mr.

Morrison on the side of his face or shoulder, and saw Mr. Morrison turning and

flailing his arms back at the CO.  The next thing Mr. Steele saw was CO O'Connor

holding his own nose, which was suddenly bleeding heavily.  Mr. Morrison ran

down the stairs with CO O'Connor in hot pursuit, chasing him and spraying mace

at the whole tier, at 6:21:10.

     Mr. Alex Christie, who had followed CO O'Connor partly up the "N" stairs

and was watching, recalls hearing Mr. Morrison tell CO O'Connor: "Get out of my

face. I can't fight no police, that's seven years fighting with police."  Then, at

6:20:56, when a crowd had gathered at the bottom of the stairs, Mr. Christie  heard

CO O'Conner say "Put your hands behind your back!" and Mr. Morrison ask

"Why you cuffing me, what did I do?" At that point, Mr. Christie saw CO

O'Conner forcibly push Mr. Morrison around and hit him on the neck with his fist.

Mr. Christie states that his attention was interrupted by people around him for a

moment, but then he looked up again and saw Mr. Morrison running down the

stairs.  Behind him was CO O'Connor, his nose bleeding profusely, chasing Mr.

Morrison down the stairs, and spraying his mace in an indiscriminate manner.

## B. Discussion and Mitigation

Although Fabian Morrison has accepted responsibility for assaulting Correction Officer Brian O'Connor, and concedes that CO O'Connor was "performing an official duty" during the course of this incident, it is nevertheless respectfully submitted that CO O'Connor's actions unnecessarily provoked the tensions which escalated into an encounter between himself and Mr. Morrison:

- CO O'Conner seriously over-reacted to finding "contraband" -- a pair of orange boxers – in Mr. Morrison's cell.
- CO O'Connor refused to listen to Mr. Morrison's reasonable explanation for having those orange boxers, thus initiating the hostile interaction between himself and Mr. Morrison.
- Ignoring Mr. Morrison's attempts to explain why he had only orange boxers, CO O'Connor walked away carrying his plastic bag with the "contraband," but wheeled around and rushed back after Mr. Morrison called him "Nigger."  To on-lookers, CO O'Connor, who is white, appeared angry and highly agitated.
- Then, after yelling reprimands directly in his face, CO O'Connor left Mr. Morrison sitting in the improvised "barber's chair" without further incident.
- Several minutes later, however, CO O'Connor suddenly returned to confront Mr. Morrison, ordering him to put his hands behind his back to be cuffed.  Both Mr. Steele and Mr. Morrison understand that BOP protocol requires that if an officer knows he's going to handcuff an

inmate, the officer is supposed to alert a captain and two witnesses before proceeding. This did not happen.

- When Mr. Morrison asked why he was being hand-cuffed, CO O'Connor threw Mr. Morrison against the wall so hard that Mr. Morrison hurt his head.

- Joseph Steele saw CO O'Connor, who is larger and much heavier than Mr. Morrison, hit Mr. Morrison either on the side of his face or his shoulder, while Alex Christie thought the blow landed on the back of Mr. Morrison's neck.

- It was only after he was hit that Mr. Morrison struck back by flailing his arms and elbows at CO O'Connor, hitting CO O'Connor on the nose.

Fabian Morrison recognizes that he did not have the right to strike CO O'Connor on his nose.  He acknowledges that CO O'Connor was performing an official duty by placing him in handcuffs, and he had no right to resist.  Accordingly, he entered a plea of guilty to the charge of assaulting a Corrections Offices.

That said, he is still at a loss to understand how his involuntary possession of orange boxer underwear got magnified into an incident that became a federal crime.   Mr. Steele, Mr. Christie and Mr. Morrison all perceived that, on the day of this incident, CO O'Connor appeared to be geared up for an altercation. Regrettably, this perception was not without a basis.  All three men have described CO O'Connor as being known for spending much time in the Bubble, ostentatiously looking at "White-Supremacist," confederate and gun websites on the computer.  Mr. Steele and Mr. Morrison both describe CO O'Connor as having had several previous physical altercations on 5-South, including another incident

where he also chased an inmate while discharging mace at the whole Unit.  And there are indications that CO O'Connor was already "gunning for" Mr. Morrison several hours before this incident occurred.  Earlier that afternoon, Joseph Steele had overheard CO O'Connor telling another officer, "I'm going to knock his gold teeth out of his mouth!"  Later Mr. Steele realized that Fabian Morrison was the inmate in the Unit who had a signature gold "grill" adorning his front teeth.  To this day, Fabian Morrison does not know what prompted the CO's angry attitude towards him, other than his possession of orange boxer shorts.

Thus, Mr. Morrison does not deny or dispute that he struck CO O'Connor while he was placing him in custody and attempting to handcuff him, and that such action by CO O'Connor was during the "performance of an official duty." Nevertheless, it is respectfully submitted that CO O'Connor's actions and the circumstances leading up to the assault may be seen as mitigation for the purposes of determining a sentence that is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

## V.  CONCLUSION:  THE APPROPRIATE SENTENCE

Even though Fabian Morrison was charged with being part of a violent Racketeering Enterprise Conspiracy, his principal activity as an associate of this group was to sell marijuana.  Following his arrest, he hit and injured a larger, bullying MCC Correction Officer, after that officer had slammed him against a concrete wall and struck him on  his head.  What Mr. Morrison may have done to warrant the Officer's decision to physically discipline him remains ambiguous. That said, Mr. Morrison fully takes responsibility for the unlawful activities which have placed him in this predicament.

It is clear that, with time and serious thought, Mr. Morrison has come to recognize that his past way of living only led to incarceration and separation from his children. While detained, he has taken a number of courses to help him once he is released, including "Breaking the Cycle" and Non-Residential Drug Abuse Treatment. He has done a tremendous amount of self-reflection on the triggers that have led to his drug abuse, his unwise decisions and his criminal conduct. He has acknowledged that he used to experience a false sense of "being alive" when he was on drugs; now, however, the courses he has actively engaged in have allowed him to see that those feelings of "being high" were merely a cover for his feelings of insecurity and sadness. He believes that he has now reached a level where he can put aside seeking approval and popularity from his peers. Indeed, Fabian seems to have come to an understanding of what matters in his life. His children are his primary concern; and he insists that when he is released he will focus on obtaining the tools that will allow him to provide for his family in productive pursuits – "not selling drugs but finding a job or a career that will help me support my family."

And as for his absent parent, Anthony Morrison, both father and son have talked lately of improving their relationship. Mr. Morrison's father, who currently resides in Atlanta with his common-law wife Allyson Powell, has vowed to be there for Fabian going forward. He acknowledges that he has not been there for Fabian in the past, and attributes that partly to his own instability. He insists that he is now more stable, living in a middle-class development in the suburbs of Atlanta. His home now has a room 'reserved for Fabian when he cares to come. He will always have a home here for him and his kids."

Mr. Morrison's mother, Lola, will be retiring from North Central Hospital in 2019. She has constructed a home in Jamaica where she eventually plans to reside

after her retirement.  For now, she is doing well living with Fabian's fiancé and daughters in Mount Vernon.  She believes she will be in a good position to provide "some semblance of peace and solitude for Fabian….as he transitions back to the community."

As he prepares for a life after prison, Fabian Morrison has taken decisive and positive steps to arm himself with tools that can help pave the way for a productive transition.  In addition to earning his GED, he has enrolled in a collaborative study program at the MCC.  Significantly, he is making conscious efforts to nurture the mutual love and support he shares with his fiancé, his mother and his children.  He recognizes that these close family relationships will help him establish the stable foundation that he will need for his successful re-entry into society.

Accordingly, for all the foregoing reasons, it is respectfully submitted that a variance from the Guidelines range of 84-105 months is warranted. A sentence including a term of imprisonment of sixty (60) months would be sufficient, but not greater than necessary, to accomplish the goals of sentencing. Because Mr. Morrison has been serving an undischarged forty-one (41) month sentence for possession of firearm, which is relevant conduct to Count One herein (the Racketeering Conspiracy), the instant sentence must run concurrently with his previous sentence of 41-months' incarceration, pursuant to USSG §5G1.3(b)(1) and (2); and the Court must enter the resulting computation as the sentence in the Judgment.

For example:   Mr. Morrison began serving his 41-month sentence on January 21, 2015 (PSR ¶ 62). Since the undischarged period of imprisonment will not be credited to this federal sentence (*See* 18 USC §3585), if the Court determines that a sentence of 60 months is warranted, the Court must then subtract

41 months from the 60 months it intends to impose, and enter the resulting 19 months as the final Judgment.

Finally, because Mr. Morrison's family and loved ones all live in the New York City area, it is respectfully requested that the Court recommend that the Bureau of Prisons designate Fabian to a facility as close to New York City as possible.

Dated:          December 5, 2017

Respectfully submitted,

*Peter E. Quijano*

Peter Enrique Quijano

*Carmeta Albarus-Lindo on the Brief*

cc:     A.U.S.A. Rachel Maimin  (by email)
         U.S.P.O. Pamela C. Flemen (by email)